## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re Marjorie L. Wall,            ) | Case No. 13-36929-KRH |
|                              ) | |
|                              ) | |
|           Debtor     ) | Chapter 13 |
| _____ ) | |
|                              ) | |
| William M. McCoy,          ) | |
|                              ) | |
|          Plaintiff     ) | |
| v.                                   ) | |
|                              ) | |
| Marjorie L. Wall,           ) | |
|                              ) | |
|          Defendant    ) | |
| _____ ) | |

### COMPLAINT TO DETERMINE DISCHARGABILTY
### PURSUANT TO FED.R.BANKER. PROC. 523(a)(2)(A)

**NOW COMES** the Plaintiff, William M. McCoy, and states as follows:

### JURISDICTION

1.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.    William M. McCoy, the Plaintiff, is a resident of Farmville Virginia.

3.    Marjorie Lancaster Wall is a disbarred Virginia attorney. At all times at issue in this case, she conducted a law practice in the Farmville Virginia vicinity.

4.    The Debtor, Ms. Wall, filed a Petition for Relief under Chapter 13 on December 30, 2013, Case No. 13-36929-KRH. The      Fifty-Six      Thousand      Dollar

DOUGLAS A. SCOTT, PLC
Suite 311, 1805 Monument Avenue
Richmond, Virginia 23220
Counsel to William M. McCoy

($56,000.00) obligation to Mr. McCoy, induced by Ms. Wall's intentional fraud, is listed

on Schedule F, Docket No. 10, Page 15 of 39.

## FACTS

5.      On October 15, 2013, Ms. Wall presented a Consent to the Revocation of

her law license to the Virginia State Bar Disciplinary Board, VSB Docket No. 13-031-

095190 & 13-031-095221, while disciplinary charges were still pending against her. Ms.

Wall's Affidavit admitted that the Virginia State Bar Disciplinary Board's charges

against her were true and consented to the revocation of her law license in the

Commonwealth. Ms. Wall executed this Affidavit on October 8, 2013. A true and correct

copy of the Disciplinary Board's public proceedings record, including Ms. Wall's

Consent, is attached hereto as **EXHIBIT A.**

6.      May 30, 2013, William M. McCoy presented his Wells Fargo Bank's

Cashier's Check to Ms. Wall in the amount of Fifty-Six Thousand Dollars ($56,000.00

USD). The endorsement of this personal loan to Ms. Wall reads as follows:

Pay to the Order of
Benchmark Community Bank
Farmville, VA 23991-U215
051402482
For Deposit Only
Wall Law Offices, PLC
Client Trust Account
300641273

A true and correct copy of both sides of the Cashier's Check delivered to Ms. Wall by

Mr. McCoy is attached hereto **as EXHIBIT B.**

2

7.    On August 5, 2012, Ms. Wall opened a new operating account at Benchmark Community Bank. **EXHIBIT A, ¶ 34.** On **August 14, 2012,** Ms. Wall opened a [lawyer] trust account at Benchmark also. **Id.** Ms. Wall was the only person who had authority to transfer money out of these Benchmark Bank Operating and Trust accounts. **EXHIBIT A, ¶ 41.**

8.    Exhibit A addresses, *inter alia,* VSB Docket No. 13-031-095221, a matter involving Ms. Wall and a Mr. David Clark. On Page 5 of 5 of the document, the Virginia State Bar states, "On May 31, 2013, several days after a meeting with the [Virginia State Bar] investigator, Ms. Wall wired $56,000 to Mr. Clark's account."

9.    Mr. McCoy had not met Ms. Wall until his fiancé died, and Ms. Wall was selected to handle her estate. At a meeting with Mr. McCoy, Ms. Wall told him that she had suffered a theft loss when her secretary (based upon Plaintiff's information and belief, one Jamie Abbott) stole checks from Ms. Wall's bank deposits.

10.    Based upon these representations by Ms. Wall, Mr. McCoy agreed to assist Ms. Wall with a one-year loan of money

11.    The purported facts related by Ms. Wall to the Plaintiff were intentionally false.

12.    Ms. Wall had suffered no loss due to a theft (or thefts) by her secretary. Based upon Plaintiff's information and belief, the Secretary stole no money from Ms. Wall.

13. Ms. Wall knew that her Secretary had not stolen money from her. Ms. Wall fraudulently intended to deceive Mr. McCoy when she told this false story to him. Mr. McCoy reasonably relied upon the false representations made by Ms. Wall.

14. When Ms. Wall made the false statement about her Secretary, she knew the statement was false and she made the statement with the specific intention of deceiving Mr. McCoy. Mr. McCoy reasonably relied upon Mr. Wall's false statement about thefts by Ms. Wall's Secretary, and sustained thereby a Fifty-Six Thousand Dollar ($56,000.00 USD) loss based upon the proximate cause of Ms. Wall's false representations.

15. None of the law office staff was stealing from Ms. Wall. Rather, Ms. Wall was experiencing financial losses from her law practice because, *inter alia*: (i) she did not perform regular and accurate trust account reconciliations; (ii) did not keep complete and accurate bank account records; (iii) overdrew her law practice operating account; (iv) transferred trust funds into her operating account without regard to acceptable billing practices; and (v) misrepresented material facts to one or more of her clients.

16. As the result of his reasonable reliance upon the false representations made by Ms. Wall, Mr. McCoy turned over a $56,000.00 Cashier's Check to Ms. Wall, and thereby sustained a $56,000 loss. Ms. Wall has filed a Chapter 13 Bankruptcy and Mr. McCoy assesses the prospect of any recovery to be slim. Nevertheless, Ms. Wall is attempting to discharge a debt to Mr. McCall in a manner contrary to that allowed by 11 U.S.C. § 523(a)(2)(A).

17. Long after she obtained the $56,000.00 from Mr. McCoy, on or about September 30, 2013, Ms. Wall had executed a Fifty-Six Thousand Dollar ($56,000.00

USD) Promissory Note in favor of William M. McCoy. A true and correct copy of the

Promissory Note is attached hereto as **EXHIBIT C**. Mr. McCoy and Ms. Wall had

previously discussed the proposed terms of the loan, which were <u>not</u> reflected at all in the

executed and delivered Note:

> (a)    The Note was stated to be without interest;

> (b)    The term of the Note was set out as Ten Years (10 years) instead of One Year (1 year), as previously agreed;

> (c)    The Note payment was scheduled as Five Hundred Dollars ($500.00 USD) per month, instead of a payment that would amortize the Note in one year[1]; and

> (d)    The Note would be *entirely* forgiven if *either* Mr. McCoy *or* Ms. Wall were to die before the Note was paid in full, a subject that was *never* discussed or agreed by Mr. McCoy and Ms. Wall.

18.    Mr. McCoy had never agreed to the terms set out in ¶ 17(a) through (d) of

the Promissory Note drafted by Ms. Wall. Ms. Wall knew that the Promissory Note she

had drafted and presented to Mr. McCoy did not represent the previous agreement of the

parties regarding the terms of the loan. Ms. Wall intended by way of the false terms

contained in the Promissory Note to deceive Mr. McCoy, and did deceive Mr. McCoy.

Mr. McCoy reasonably relied upon the false representations stated by Ms. Wall and

contained in the Promissory Note.

19.    Mr. McCoy sustained a $56,000 loss as the result of these false

representations.

---

[1] Or roughly $4,666.67 dollars per month, computed *without* interest.

20.    At no time did Ms. Wall inform Mr. McCoy that she was under disciplinary investigation by the Virginia State Bar; nor that Mr. David Clark had filed a Bar complaint against her on March 25, 2013; nor that she had met with Virginia State Bar investigators several times about the Clark complaint, to whom she had stated that she had "no idea" what money was in her [Benchmark Bank] lawyer trust account; nor that she owed Mr. David Clark $56,000.00, which, based upon Plaintiff's information and belief, she paid to Mr. David Clark on May 31, 2013 with the funds that Ms. Wall defrauded from the Plaintiff with respect to the McCoy "loan."

21.    Ms. Wall had no present intention whatsoever to pay the $56,000 back to Mr. McCoy (i) on May 30, 2013, when she received it from Mr. McCoy, or (ii) on September 30, 2013, when she delivered the false Promissory Note to Mr. McCoy. The Promissory Note by its own terms made perfectly clear that Ms. Wall did not then presently intend to re-pay Mr. McCoy based upon the fraudulent provisions she included in that Promissory Note cited above in ¶ 17(a) – (d). Ms. Wall intended that Mr. McCoy be defrauded as to the contents of the Promissory Note; Mr. McCoy was defrauded by Ms. Wall with respect to the terms of the Promissory Note; Mr. McCoy reasonably relied upon Ms. Wall's false representations contained the Promissory Note, and sustained $56,000.00 in damages as a result thereby.

**WHEREFORE**, the Plaintiff prays that the Court enter an Order finding that the $56,000.00 owed by Ms. Wall to Mr. McCoy is non-dischargeable pursuant to the provisions of § 523(a)(2)(A); that the Plaintiff be awarded judgment against Marjorie Lancaster Wall, in the sum of Fifty-Six Thousand Dollars ($56,000.00), plus pre-

6

judgment and post-judgment thereon at the rate specified pursuant to 28 U.S.C. §1961, calculated on a *per annum* basis from May 30, 2013 until paid; that Plaintiff's attorney fees and costs be incorporated into the judgment; and for such other and further relief as may be just and proper.

Dated: April 14, 2014

\s\ Douglas Scott
Douglas Scott, VSB No. 28211
DOUGLAS A. SCOTT, PLC
1805 Monument Avenue, Suite 311
Richmond, Virginia 23220
☎ 804 257.9860
Counsel to William M. McCoy

## CERTIFICATE OF SERVICE

I, the undersigned, do certify that on this day I served a true and correct copy of the Complaints and Exhibits on Ms. Wall's bankruptcy counsel, as follows:

Nnika E. White, Esquire
The law Offices of White & Associates, PC
9101 Midlothian Turnpike, Suite 800
Richmond Virginia 23235

*via* the Court's ECF facility.

\s\ Douglas Scott

Macintosh HD:Case Files:Case Files:M:McCoy, William- 523(a)(2) claim:Complaint.docx

*VIRGINIA:*

## Before the Virginia State Bar Disciplinary Board

*In the Matters of*

*Marjorie Lancaster Wall*
*Attorney at Law*

*VSB Docket Nos. 13-031-095190*
*13-031-095221*

On October 15, 2013, came Marjorie Lancaster Wall and presented to the Board an
Affidavit Declaring Consent to Revocation of her license to practice law in the courts of this
Commonwealth. By tendering her Consent to Revocation at a time when disciplinary charges
are pending, she admits that the charges in the attached Certification document are true.

The Board having considered the said Affidavit Declaring Consent to Revocation, and
Bar Counsel having no objection, the Board accepts her Consent to Revocation. Accordingly, it
is ordered that the license to practice law in the courts of this Commonwealth heretofore issued
to the said Marjorie Lancaster Wall be and the same hereby is revoked, and that the name of the
said Marjorie Lancaster Wall be stricken from the Roll of Attorneys of this Commonwealth.

Entered this 15th day of October, 2013

For the Virginia State Bar Disciplinary Board

By _____
Barbara Sayers Lanier, Clerk of the Disciplinary System



PLAINTIFF'S
EXHIBIT

A

VIRGINIA:

OCT 1 5 2013

### BEFORE THE VIRGINIA STATE BAR DISCIPLINARY BOARD

IN THE MATTER OF
MARJORIE LANCASTER WALL

VSB Docket Nos.    13-031-095190
13-031-095221

### AFFIDAVIT DECLARING CONSENT TO REVOCATION

Marjorie Lancaster Wall, after being duly sworn, states as follows:

1.    That Marjorie Lancaster Wall was licensed to practice law in the Commonwealth of Virginia on 09/29/1983;

2.    That Marjorie Lancaster Wall submits this Affidavit Declaring Consent to Revocation pursuant to Rule of Court, Part 6, Section IV, Paragraph 13-28.

3.    That Marjorie Lancaster Wall's consent to revocation is freely and voluntarily rendered, that Marjorie Lancaster Wall is not being subjected to coercion or duress, that Marjorie Lancaster Wall has been represented by and consulted with competent counsel about this Affidavit and the above-captioned cases pending against her, and that Marjorie Lancaster Wall is fully aware of the implications of consenting to the revocation of her license to practice law in the Commonwealth of Virginia;

4.    Marjorie Lancaster Wall is aware that there are currently pending complaints, investigations into, or proceedings involving, allegations of misconduct, the docket numbers for which are set forth above, and the specific nature of which is set forth in Exhibit A attached hereto.

5.    Marjorie Lancaster Wall acknowledges that the material facts upon which the allegations of misconduct are predicated are true; and

6.    Marjorie Lancaster Wall submits this Affidavit and consents to the revocation of her license to practice law in the Commonwealth of Virginia because she knows that if the disciplinary proceedings based on the said alleged misconduct were brought or prosecuted to a conclusion, she could not successfully defend them.

Executed and dated on _October 8, 2013_ .

_Marilyn Lancaster Wall_
Marjorie Lancaster Wall
Respondent

COMMONWEALTH OF VIRGINIA
CITY/COUNTY OF _Prince Edward_ , to wit:

The foregoing Affidavit Declaring Consent to Revocation was subscribed and sworn to before me by Marjorie Lancaster Wall on _October 8, 2013_

Notary Public

My Commission expires: _4-30-15_ .

PEGGY JOHNSON LOVE
NOTARY PUBLIC
REG. #7503102
MY COMMISSION EXPIRES
4-30-15
COMMONWEALTH OF VIRGINIA

SEEN, WITH NO OBJECTION TO ENTRY OF AN ORDER BY
THE VIRGINIA STATE BAR DISCIPLINARY BOARD REVOKING
MARJORIE LANCASTER WALL'S LICENSE TO PRACTICE LAW IN VIRGINIA:

Kara L. McGehee
Assistant Bar Counsel

## Exhibit A

### As to VSB Docket No. 13-031-095190

Ms. Wall qualified as the administrator of the James Manning estate in 2009 in the Chesterfield County Circuit Court. Bryan K. Selz was appointed the Commissioner for the case. An accounting for the estate was due in late 2012. Ms. Wall failed to file the accounting on time.

Commissioner Selz issued a Summons for Ms. Wall to appear in court to explain her failure to administer the estate. Ms. Wall failed to appear in the Chesterfield County Circuit Court on March 19, 2013, despite having been served with a Summons to appear that day to address her failure to file a complete accounting in the case. On March 25, 2013, Judge McCallum issued a show cause Order against a finding of contempt of court against Ms. Wall. The matter was continued to June 7, 2013.

On April 22, 2013, Ms. Wall sent Commissioner Selz a letter which enclosed a copy of an accounting. She also enclosed a similar letter dated February 13, 2013 that stated it enclosed an accounting and acknowledged that she was missing one check. She stated, "Please let me know what else needs to be paid. I will be making it out of my own pocket to that the beneficiaries receive as much as possible." Commissioner Selz did not receive a copy of the February 13, 2013 letter until she sent it to him in April. Ms. Wall admits that the letter and accounting might not have been sent to Commissioner Selz in February.

The accounting Ms. Wall sent on April 22, 2013 did not balance, and did not contain the co-administrator's signature. Commissioner Selz sent Ms. Wall a letter on April 25, 2013 which addressed these deficiencies. He stated, in part, "I am missing around $640.00."

When asked by Virginia State Bar Investigator Lisa Marshall what happened to the $640.00, Ms. Wall stated that she was unsure of what happened to the money. She admitted that she did not perform any trust account reconciliations for the Manning estate matter. As of September 17, 2013, Ms. Wall was also unable to provide Commissioner Selz with any receipts from the bonding surety company for premium payments she claims she made regarding the estate.

### As to VSB Docket No. 13-031-095221

David Clark hired Ms. Wall hired Ms. Wall to handle post-divorce issues on his behalf. He did not sign any fee agreement related to that representation. On June 1, 2012, Ms. Wall sent a letter to Mr. Clark's ex-wife's attorney which noted that Mr. Clark had "incurred legal fees of at least $2,650.00." At a hearing in July, 2012, the ex-wife paid Ms. Wall $1,000.00 for Mr. Clark's attorney's fees.

During an interview with an investigator from the Virginia State Bar, Ms. Wall produced two documents related to the fees charged to Mr. Clark in the post-divorce case. One document is dated June 20, 2012. It shows legal work done between November 1, 2011 and July 18, 2012. It shows a balance owed of $5,650.00. A second document she produced contains handwritten changes, and is dated July 18, 2012. It shows legal work performed from November 1, 2011 through July 18, 2012, and lists a balance owed of $3,150.00, "less $1,000 paid by [Mr. Clark's ex-wife.]"

On or about July 19, 2012, opposing counsel hand delivered a check to Ms. Wall for $157,096.78 due to Mr. Clark for the sale of marital property. Mr. Clark directed Ms. Wall to deposit and maintain that money in trust, and asked Ms. Wall to negotiate outstanding debts he had with several creditors prior to disbursing the remaining balance to him. During their discussion, Mr. Clark and Ms. Wall made no agreement about any outstanding or future attorney's fees owed to Ms. Wall.

On July 19, 2012, Ms. Wall deposited $157,096.78 into her trust account with Citizens Bank and Trust (hereinafter, "Citizens Bank.") This resulted in a balance of $157,895.81 for that account. On July 20, 2012, Ms. Wall made an internet fund transfer of $6,600.00 from her trust account to her operating account, which had a negative balance at that time. By August 2, 2012, Ms. Wall had again overdrawn her Citizens Bank operating account.

On August 5, 2012, Ms. Wall opened a new operating account with Benchmark Community Bank (hereinafter, "Benchmark.") On August 6, 2012, Ms. Wall made another internet transfer to her operating account for $3,000.00. Mr. Clark had not agreed to pay Ms. Wall any specific amount for the additional work she had performed in his post-divorce case, and Ms. Wall had not provided Mr. Clark with a bill for those services. Ms. Wall had not performed any of the agreed-upon debt collection work for Mr. Clark, and had not communicated to Mr. Clark about her fee for debt collection work.

Ms. Wall opened a trust account with Benchmark on or about August 14, 2012 by transferring $100,000.00 from her Citizens Bank trust account, leaving a trust account balance of $48,295.81 at Citizens Bank. From August 17 through August 29, 2012, Ms. Wall made a total of $46,300.00 in deposits into the Benchmark trust account, most of which was cash. Her deposit slips did not note the source of that cash. On or about August 30, 2012, Ms. Wall made a total of $55,760.00 in disbursements to or for the benefit of another client. This brought the balance of the Benchmark trust account down to $90,540.00.

From September through November 2012, Ms. Wall transferred a total of $7,500.00 from the Citizens Bank trust account to her Citizens Bank operating account. During that same time period, Ms.

Wall transferred a total of $29,400 out of the Benchmark trust account, with all but $2,000.00 transferred to her own Benchmark operating account.

Mr. Clark made numerous efforts to reach Ms. Wall and to obtain information about the status of his debts in late 2012. On December 20, 2012, Mr. Clark met with Ms. Wall in her office. He requested an accounting of his money, and asked for payment of the balance that remained after the payment of his debts.

At that appointment, Ms. Wall produced a handwritten document that she claimed was an accounting of his money. The document contained numerous inaccuracies, including incorrect dates of money transfers and arithmetic mistakes. In addition, the "accounting" listed payments to Mr. Clark's creditors. No such payments were ever made from any of Ms. Wall's accounts.

Mr. Clark provided Ms. Wall with his bank account information at the December 20, 2012 meeting. It was his understanding that the money Ms. Wall acknowledged she owed him would be transferred immediately.

From December 21, 2012 until January 6, 2013, Mr. Clark made numerous telephone calls to Ms. Wall's office seeking additional information about his money. On January 6, 2013, Mr. Clark sent Ms. Wall an email marked "Urgent" in which he expressed his need for an immediate transfer of the money and additional documentation about his debts and disbursement of his money.

On January 8, 2013, Ms. Wall made a wire transfer of $61,000 from her Benchmark trust account to Mr. Clark's account. This left a remaining balance of $140 of Mr. Clark's money in the account. On January 9, 2013, Ms. Wall made a wire transfer of $40,000.00 from her Citizens Bank trust account to Mr. Clark's account. This left a remaining balance of $795.81 of Mr. Clark's money in that account.

Ms. Wall met with a Virginia State Bar investigator on several occasions. She told the investigator that she had "no idea" what money was in her trust account and she admitted that she did not keep any of the trust account records required by the Rules of Professional Conduct. On May 31, 2013, several days after a meeting with the investigator, Ms. Wall wired $56,000 to Mr. Clark's account.

VIRGINIA:

OCT 1 1 2013

## BEFORE THE THIRD DISTRICT, SECTION I, SUBCOMMITTEE
OF THE VIRGINIA STATE BAR

IN THE MATTER OF
MARJORIE LANCASTER WALL          VSB Docket Nos.      13-031-095190
                                                      13-031-095221

## SUBCOMMITTEE DETERMINATION
(CERTIFICATION)

On September 11, 2013, a meeting in this matter was held before a duly convened Third

District, Section I, Subcommittee consisting of Victoria Pearson, Esquire, Subcommittee Chair;

Kevin N. Logan, Esquire; and Rev. Daniel R. Greenwood, Lay Member.  Pursuant to Part 6, §

IV, ¶ 13-15.B.3 of the Rules of the Supreme Court of Virginia, the Third District, Section I,

Subcommittee of the Virginia State Bar hereby serves upon Marjorie Lancaster Wall,

("Respondent") the following Certification:

## I. FINDINGS OF FACT

1.  At all times herein, Respondent was an attorney in good standing licensed to practice law
in the Commonwealth of Virginia.

    Docket No. 13-031-095190

2.  Respondent qualified as the administrator of the James Manning estate in 2009 in the
Chesterfield County Circuit Court.  Bryan K. Selz was appointed the Commissioner for
the case.

3.  An accounting for the estate was due in late 2012.  Respondent failed to file the
accounting on time.

4.  Commissioner Selz issued a Summons for Respondent to appear in court to explain her
failure to administer the estate.  That Summons was served on a person who worked at
Respondent's office on January 24, 2013.

5.  Respondent failed to appear in the Chesterfield County Circuit Court on March 19, 2013,
despite having been served with a Summons to appear that day to address her failure to
file a complete accounting in the case.

6. Commissioner Selz filed a complaint with the Virginia State Bar on March 22, 2013. On March 25, 2013, Judge McCallum issued a show cause Order against Respondent, and ordered her to appear at the next hearing date. The matter was continued to June 7, 2013.

7. On April 22, 2013, Respondent sent Commissioner Selz a letter which enclosed a copy of an accounting. She also enclosed a similar letter dated February 13, 2013 that stated it enclosed an accounting and acknowledged that she was missing one check. She stated, "Please let me know what else needs to be paid. I will be making it out of my own pocket so that the beneficiaries receive as much as possible." Commissioner Selz did not receive a copy of the February 13, 2013 letter until she sent it to him in April.

8. The accounting also did not balance, and did not contain the co-administrator's signature.

9. Commissioner Selz sent Respondent a letter on April 25, 2013 which addressed these deficiencies. He stated, in part, "I am missing around $640.00."

10. When asked by Virginia State Bar Investigator Lisa Marshall what happened to the $640.00, Respondent stated that she was unsure of what happened to the money. She admitted that she did not perform any trust account reconciliations for the Manning estate matter.

11. As of September 17, 2013, Respondent was also unable to provide Commissioner Selz with any receipts from the bonding surety company for premium payments she claims she made regarding the estate.

**Docket No. 13-031-095221**

**A. Attorney's Fees and Scope of Representation**

12. David Clark hired Respondent to represent him in a divorce in 2011. He signed a retainer agreement in which he agreed to pay Ms. Wall $200.00 per hour.

13. On August 3, 2011, Respondent sent Mr. Clark a letter that contained a copy of his Final Decree and told him that his "filed (sic) is now closed."

14. Mr. Clark subsequently hired Respondent to handle post-divorce issues on his behalf. On June 1, 2012, Respondent sent a letter to Mr. Clark's ex-wife's attorney which noted that Mr. Clark had "incurred legal fees of at least $2,650.00." At a hearing in July, 2012, the ex-wife paid Respondent $1,000.00 for Mr. Clark's attorney's fees.

15. During an interview with an investigator from the Virginia State Bar, Respondent produced two documents related to the fees charged to Mr. Clark in the post-divorce case.

One document is dated June 20, 2012. It shows legal work done between November 1, 2011 and July 18, 2012. It shows a balance owed of $5,650.00. A second document she produced contains handwritten changes, and is dated July 18, 2012. It shows legal work performed from November 1, 2011 through July 18, 2012, and lists a balance owed of $3,150.00, "less $1,000 paid by [Mr. Clark's ex-wife.]"

16. On or about July 19, 2012, opposing counsel hand delivered a check to Respondent for $157,096.78 due to Mr. Clark for the sale of marital property.

17. Mr. Clark directed Respondent to deposit and maintain that money in trust, and asked Respondent to negotiate outstanding debts he had with several creditors, including Bank of America, SCA Credit Services, and Discover Card, prior to disbursing the remaining balance to him. During their discussion, Mr. Clark and Respondent made no agreement about any outstanding attorney's fees owed to Respondent.

B.  Citizens Bank and Trust Accounts

18. As of July 12, 2012, Respondent had overdrawn her operating account with Citizens Bank and Trust (hereinafter, "Citizens Bank.") That day, she wrote herself a check for $1,000.00. The bank returned the check she wrote to herself for insufficient funds.

19. On July 18, 2012, Respondent had a balance of -$584.58 in her operating account with Citizens Bank and $799.03 in her trust account with Citizens Bank.

20. On July 19, 2012, Respondent deposited $157,096.78 into her trust account with Citizens Bank. This resulted in a balance of $157,895.81 for that account.

21. On July 20, 2012, Respondent made an internet fund transfer from her trust account to her operating account for $6,600.00.

22. On August 2, 2012, Respondent had again overdrawn her operating account, this time by $1,546.42.

23. On August 6, 2012, Respondent made another internet transfer of $3,000.00 from her Citizens Bank trust account to her operating account.

24. As of July 20, 2012, Mr. Clark had not agreed to pay Respondent any specific amount for the additional work she had performed in his post-divorce case, and Respondent had not provided Mr. Clark with a bill for those services.

25. As of August 6, 2012, Respondent had not performed any of the agreed-upon debt collection work for Mr. Clark, and had not communicated to Mr. Clark about her fee for debt collection work.

26. On August 15, 2012, Respondent transferred $100,000.00 from the Citizens Bank trust account to a new trust account she had opened at Benchmark Community Bank, leaving a trust account balance of $48,295.81 at Citizens Bank.

27. On September 4, 2012, Respondent overdrew her operating account with Citizens Bank, which resulted in a balance of -$497.87.

28. On September 4, 2012; September 7, 2012; and September 12, 2012, Respondent transferred $500.00; $1,000.00; and $2,500.00, respectively, from the Citizens Bank trust account to her Citizens Bank operating account.  Respondent kept no records for the reasons for those transfers, and did not receive permission from Mr. Clark to transfer that money.

29. In mid-October 2012, Respondent overdrew her Citizens Bank operating account again. Her balance on October 17, 2012 was -$333.19.

30. On October 31, 2012 and November 14, 2012, Respondent transferred $1,500.00 and $2,000.00, respectively, from the Citizens Bank trust account to her Citizens Bank operating account.  Respondent kept no records for the reasons for those transfers, and did not receive permission from Mr. Clark to transfer that money.

31. On January 3, 2013, Respondent overdrew her Citizens Bank operating account.  On January 4, 2013, her account balance was -$132.94.

32. From July 20, 2012, through May 31, 2013, Respondent made no deposits into her Citizens Bank trust account.

33. Respondent was the only person with the authority to write checks or make transfers in her Citizens Bank trust and operating accounts.

C. **Benchmark Community Bank Accounts**

34. On August 5, 2012, Respondent opened a new operating account with Benchmark Community Bank (hereinafter, "Benchmark.") Respondent opened a trust account with Benchmark on or about August 14, 2012 by transferring $100,000.00 from her Citizens trust account.

35. From August 17 through August 29, 2012, Respondent made a total of $46,300.00 in deposits into the Benchmark trust account, most of which was cash. Her deposit slips did not note the source of that cash.

36. On or about August 30, 2012, Respondent made a total of $55,760.00 in disbursements to or for the benefit of a client named Henry Rowlette. This brought the balance of the Benchmark trust account down to $90,540.00.

37. On September 12, 2012, Respondent transferred $7,000.00 from the Benchmark trust account to her operating account with Benchmark. Over the course of the next three months, Respondent depleted the Benchmark trust account down to a balance of $61,140.00, with all but $2,000.00 transferred to her own Benchmark operating account. From September 1, 2012 until February 13, 2013, she made no additional deposits into the Benchmark trust account.

38. On October 16, 2012, Respondent overdrew her Benchmark operating account, resulting in a balance of -$984.93. She made several deposits over the next few days, but again overdrew on October 22, 2012. On October 25, 2012, her account balance was -$6,155.65. That same day, she transferred $6,900.00 from her Benchmark trust account into her operating account.

39. Respondent transferred funds from her Benchmark trust account into her Benchmark operating account to cover negative account balances on November 14, 2012 and November 26, 2012.

40. Respondent did not report any of the transfers of Mr. Clark's funds to Mr. Clark. She did not keep records of the reasons for any of the transfers, and none of the money in either account was transferred to any of Mr. Clark's creditors, including but not limited to Asset Acceptance, Northland Group, Discover, and/or SCA.

41. Respondent was the only person who had the authority to transfer money out of her Benchmark trust and operating accounts.

**D. Communication with Mr. Clark**

42. Mr. Clark made numerous efforts to reach Respondent and to obtain information about the status of his debts in late 2012. On December 20, 2012, Mr. Clark met with Respondent in her office. He requested an accounting of his money, and asked for payment of the balance that remained after the payment of his debts.

43. At that appointment, Respondent produced a handwritten document that she claimed was an accounting of his money. The document contained numerous inaccuracies, including incorrect dates of money transfers and arithmetic mistakes. In addition, the "accounting" listed payments to Mr. Clark's creditors, to wit: $3,256.00 to Asset Acceptance, $19,388.60 to Northland Group, Inc., $2,904.07 to Discover, and $393.98 to SCA. No such payments were ever made from any of Respondent's accounts.

44. The "accounting" listed $121,554.13 as being owed to Mr. Clark, but only listed a total of $101,700.00 "being wired in" to Mr. Clark. Mr. Clark provided Respondent with his bank account information at the December 20, 2012 meeting. It was his understanding that the money would be transferred immediately.

45. From December 21, 2012 until January 6, 2013, Mr. Clark made numerous telephone calls to Respondent's office seeking additional information about his money. On January 3, 2013, Respondent sent Mr. Clark an email that stated, in its entirety, "I just saw the message from Jamie. What's up? How are things in Florida?"

46. On January 6, 2013, Mr. Clark sent Respondent an email marked "Urgent" in which he expressed his need for an immediate transfer of the money and additional documentation about his debts and disbursement of his money.

47. On January 8, 2013, Respondent made a wire transfer of $61,000 from her Benchmark trust account to Mr. Clark's account. This left a remaining balance of $140 in the account, which was also Mr. Clark's money.

48. On January 9, 2013, Respondent made a wire transfer of $40,000.00 from her Citizens Bank trust account to Mr. Clark's account. This left a remaining balance of $795.81 in that account, which was also Mr. Clark's money.

49. On January 14, 2013, Respondent sent Mr. Clark a letter which enclosed a bill, and claimed that the bill "has already been sent... back in August." Respondent stated that she was enclosing copies of letters she sent to Mr. Clark's creditors. Those letters indicated a copy was sent to "client," but Mr. Clark had never seen those letters before. Respondent also enclosed a copy of check number 1087 from the Citizens Bank trust account made payable to Northland Group, Inc., dated November 29, 2012. There were no other copies of checks enclosed. The Citizens Bank records indicate that check 1087 was never presented for payment.

### E. Communication with the Bar

50. Mr. Clark filed a complaint with the Virginia State Bar on March 25, 2013.

51. A copy of the complaint was sent to Respondent on April 4, 2013. The letter enclosing the complaint instructed Respondent to respond to the allegations contained therein within 21 days. The letter also stated that Respondent had a duty to comply with the request pursuant to Rule 8.1(c) of the Rules of Professional Conduct.

52. Respondent did not respond to the complaint, and the case was referred to an investigator on May 13, 2013.

53. Respondent met with the Virginia State Bar investigator on several occasions. She told the investigator that she had "no idea" what money was in her trust account and she admitted that she did not keep any of the trust account records required by the Rules of Professional Conduct. She claimed that she relied on her secretary to tell her if money had been earned before she transferred it to her operating accounts, and that she thought the secretary was taking care of the trust account record keeping.

54. Respondent also told the investigator that she had negotiated Mr. Clark's debts, but that she was unable to produce any notes from conversations with his creditors or any documentation about those negotiations, other than what she sent to Mr. Clark on January 14, 2013.

55. When asked about the whereabouts of the former secretary, Jamie Abbott, Respondent told the investigator that she thought Ms. Abbott had gone to South Carolina to take care of her sick mother and that she did not have Ms. Abbott's contact information.

56. In fact, Respondent was aware of Ms. Abbott's whereabouts, and had sent Ms. Abbott an email and had confronted Ms. Abbott at her new workplace in Farmville, Virginia, after Ms. Abbott stopped working for her.

57. On or about May 31, 2013, several days after meeting with the Virginia State Bar investigator, Respondent wired $56,000.00 to Mr. Clark.

## II. NATURE OF MISCONDUCT

Such conduct by Respondent constitutes misconduct in violation of the following provisions of the Rules of Professional Conduct:

Docket No. 13-031-095190

Rule 1.1 -- Competence

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

Rule 1.3 - Diligence

(a) A lawyer shall act with reasonable diligence and promptness in representing a client.

Rule 1.15 -- Safekeeping Property

(b) Specific Duties. A lawyer shall:

(1) promptly notify a client of the receipt of the client's funds, securities, or other properties;

(2) identify and label securities and properties of a client, or those held by a lawyer as a fiduciary, promptly upon receipt;

(3) maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accountings to the client regarding them;

(4) promptly pay or deliver to the client or another as requested by such person the funds, securities, or other properties in the possession of the lawyer that such person is entitled to receive; and

(5) not disburse funds or use property of a client or third party without their consent or convert funds or property of a client or third party, except as directed by a tribunal.

(c) Record-Keeping Requirements. A lawyer shall, at a minimum, maintain the following books and records demonstrating compliance with this Rule:

(1) Cash receipts and disbursements journals for each trust account, including entries for receipts, disbursements, and transfers, and also including, at a minimum: an identification of the client matter; the date of the transaction; the name of the payor or payee; and the manner in which trust funds were received, disbursed, or transferred from an account.

(2) A subsidiary ledger containing a separate entry for each client, other person, or entity from whom money has been received in trust.
The ledger should clearly identify:

(i) the client or matter, including the date of the transaction and the payor or payee and the means or methods by which trust funds were received, disbursed or transferred; and

(ii) any unexpended balance.

(3) In the case of funds or property held by a lawyer as a fiduciary, the required books and records shall include an annual summary of all receipts and disbursements and changes in assets comparable in detail to an accounting that would be required of a court supervised fiduciary in the same or similar capacity; including all source documents sufficient to substantiate the annual summary.

(4) All records subject to this Rule shall be preserved for at least five calendar years after termination of the representation or fiduciary responsibility.

(d) Required Trust Accounting Procedures. In addition to the requirements set forth in Rule 1.15 (a) through (c), the following minimum trust accounting procedures are applicable to all trust accounts.

(1) Insufficient Fund Reporting. All accounts are subject to the requirements governing insufficient fund check reporting as set forth in the Virginia State Bar Approved Financial Institution Agreement.

(2) Deposits. All trust funds received shall be deposited intact. Mixed trust and non-trust funds shall be deposited intact into the trust fund and the non-trust portion shall be withdrawn upon the clearing of the mixed fund deposit instrument. All such deposits should include a detailed deposit slip or record that sufficiently identifies each item.

(3) Reconciliations.

(i) At least quarterly a reconciliation shall be made that reflects the trust account balance for each client, person or other entity.

(ii) A monthly reconciliation shall be made of the cash balance that is derived from the cash receipts journal, cash disbursements journal, the trust account checkbook balance and the trust account bank statement balance.

(iii) At least quarterly, a reconciliation shall be made that reconciles the cash balance from (d)(3)(ii) above and the subsidiary ledger balance from (d)(3)(i).

(iv) Reconciliations must be approved by a lawyer in the law firm.

(4) The purpose of all receipts and disbursements of trust funds reported in the trust journals and ledgers shall be fully explained and supported by adequate records.

## Docket No. 13-031-095221

### Rule 1.3 - Diligence

(a) A lawyer shall act with reasonable diligence and promptness in representing a client.

### Rule 1.4 - Communication

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

### Rule 1.5 – Fees

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

(b) The lawyer's fee shall be adequately explained to the client. When the lawyer has not regularly represented the client, the amount, basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

Rule 1.15 – Safekeeping Property
    (a)Depositing Funds.
        (1) All funds received or held by a lawyer or law firm on behalf of a client or a third party, or held by a lawyer as a fiduciary, other than reimbursement of advances for costs and expenses shall be deposited in one or more identifiable trust accounts or placed in a safe deposit box or other place of safekeeping as soon as practicable.
        (2) For lawyers or law firms located in Virginia, a lawyer trust account shall be maintained only at a financial institution approved by the Virginia State Bar, unless otherwise expressly directed in writing by the client for whom the funds are being held.
        (3) No funds belonging to the lawyer or law firm shall be deposited or maintained therein except as follows:
            (i) funds reasonably sufficient to pay service or other charges or fees imposed by the financial institution or to maintain a required minimum balance to avoid the imposition of service fees, provided the funds deposited are no more than necessary to do so; or
            (ii) funds in which two or more persons (one of whom may be the lawyer) claim an interest shall be held in the trust account until the dispute is resolved and there is an accounting and severance of their interests. Any portion finally determined to belong to the lawyer or law firm shall be withdrawn promptly from the trust account.
(b) Specific Duties. A lawyer shall:
    (1) promptly notify a client of the receipt of the client's funds, securities, or other properties;
    (2) identify and label securities and properties of a client, or those held by a lawyer as a fiduciary, promptly upon receipt;
    (3) maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accountings to the client regarding them;
    (4) promptly pay or deliver to the client or another as requested by such person the funds, securities, or other properties in the possession of the lawyer that such person is entitled to receive; and
    (5) not disburse funds or use property of a client or third party without their consent or convert funds or property of a client or third party, except as directed by a tribunal.
(c) Record-Keeping Requirements. A lawyer shall, at a minimum, maintain the following books and records demonstrating compliance with this Rule:
    (1) Cash receipts and disbursements journals for each trust account, including entries for receipts, disbursements, and transfers, and also including, at a minimum: an identification of the client matter; the date of the transaction; the name of the payor or payee; and the manner in which trust funds were received, disbursed, or transferred from an account.

(2) A subsidiary ledger containing a separate entry for each client, other person, or entity from whom money has been received in trust.
The ledger should clearly identify:

(i) the client or matter, including the date of the transaction and the payor or payee and the means or methods by which trust funds were received, disbursed or transferred; and

(ii) any unexpended balance.

(3) In the case of funds or property held by a lawyer as a fiduciary, the required books and records shall include an annual summary of all receipts and disbursements and changes in assets comparable in detail to an accounting that would be required of a court supervised fiduciary in the same or similar capacity; including all source documents sufficient to substantiate the annual summary.

(4) All records subject to this Rule shall be preserved for at least five calendar years after termination of the representation or fiduciary responsibility.

(d) Required Trust Accounting Procedures. In addition to the requirements set forth in Rule 1.15 (a) through (c), the following minimum trust accounting procedures are applicable to all trust accounts.

(1) Insufficient Fund Reporting. All accounts are subject to the requirements governing insufficient fund check reporting as set forth in the Virginia State Bar Approved Financial Institution Agreement.

(2) Deposits. All trust funds received shall be deposited intact. Mixed trust and non-trust funds shall be deposited intact into the trust fund and the non-trust portion shall be withdrawn upon the clearing of the mixed fund deposit instrument. All such deposits should include a detailed deposit slip or record that sufficiently identifies each item.

(3) Reconciliations.

(i) At least quarterly a reconciliation shall be made that reflects the trust account balance for each client, person or other entity.

(ii) A monthly reconciliation shall be made of the cash balance that is derived from the cash receipts journal, cash disbursements journal, the trust account checkbook balance and the trust account bank statement balance.

(iii) At least quarterly, a reconciliation shall be made that reconciles the cash balance from (d)(3)(ii) above and the subsidiary ledger balance from (d)(3)(i).

(iv) Reconciliations must be approved by a lawyer in the law firm.

(4) The purpose of all receipts and disbursements of trust funds reported in the trust journals and ledgers shall be fully explained and supported by adequate records.

## Rule 8.1 – Bar Admission and Disciplinary Matters

An applicant for admission to the bar, or a lawyer already admitted to the bar, in connection with a bar admission application, any certification required to be filed as a condition of maintaining or renewing a license to practice law, or in connection with a disciplinary matter, shall not:

(a) knowingly make a false statement of material fact

Rule 8.4 - Misconduct
It is professional misconduct for a lawyer to:

      (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation which reflects adversely on the lawyer's fitness to practice law

## III. CERTIFICATION

Accordingly, it is the decision of the Subcommittee to certify the above matters to the

Virginia State Bar Disciplinary Board.

THIRD DISTRICT, SECTION I,
SUBCOMMITTEE
OF THE VIRGINIA STATE BAR

By _Victoria N. Pearson_____

Victoria N. Pearson
Subcommittee Chair

## CERTIFICATE OF SERVICE

I certify that on *October 11th*, 2013, I mailed by certified mail a true and correct copy of the foregoing Subcommittee Determination (Certification) to Marjorie Lancaster Wall, Esquire, Respondent, at PO Box K, Farmville, VA 23901, Respondent's last address of record with the Virginia State Bar, and by first class mail, postage prepaid, to Leslie Ann Takacs Haley, counsel for Respondent, at Haley Law PLC, PO Box 943, Midlothian, VA 23113.

Kara L. McGehee
Assistant Bar Counsel

| Routing | Sequence # | Paid Date | Amount | Account | Serial | Capture Source |
|---------|-----------|-----------|--------|---------|--------|----------------|
| 10700543 | 8211195356 | 05302013 | $56000.00 | 4861009181 | 6874200377 | 00007340 |

PRINTED ON LINEMARK PAPER - HOLD TO LIGHT TO VIEW. FOR ADDITIONAL SECURITY FEATURES SEE BACK.

0088742        11-24
Office AU #     1210(6)

Operator I.D.:  u243014      va001570

**CASHIER'S CHECK**                               6874200377

PAY TO THE ORDER OF    ***MARJORIE L. WALL***                    May 30, 2013

***Fifty-six thousand dollars and no cents***          **$56,000.00**

WELLS FARGO BANK, N.A.
127 N MAIN ST
FARMVILLE, VA 23901
FOR INQUIRIES CALL (480) 394-3122                    VOID IF OVER US $  56,000.00
                                                     AUTHORIZED SIGNATURE

⑈6874200377⑈ ⑆121000248⑆4861 009181⑈

0083312787

051402482  1305300308
03080108B

030800010000000111

PAY TO THE ORDER OF
BENCHMARK COMMUNITY BANK
FARMVILLE, VA 23925-2625
\ 051402482
FOR DEPOSIT ONLY
WALL LAW OFFICE, PLC
CLIENT TRUST ACCOUNT
30541273



PLAINTIFF'S
EXHIBIT

B

tabbies

## PROMISSORY NOTE

$56,000.00

September 29, 2013

**FOR VALUE RECEIVED**, the undersigned, **MAJRORIE L. WALL** (the "Borrower"), promise to pay to the order of **WILLIAM M MCCOY** ("Lender"), at the address of Lender or at such other place as the holder of this Note may from time to time designate in writing, the principal sum of Fifty-six Thousand Dollars ($56,000.00), together with no interest on the unpaid principal amount will be due and payable in monthly installments of $500.00 with the first payment due October 15, 2013 and final balloon payment due September 15, 2023.

Principal shall be payable in lawful money of the United States of America. Borrower may at any time prepay all or any part of the principal amount hereof without premium or penalty, but with accrued interest to the date of such prepayment. All prepayments will be applied to installments coming due hereunder in their inverse order of maturity. Amounts prepaid may not be reborrowed.

The principal sum evidenced by this Note, together with accrued interest, shall become immediately due and payable at the option of Lender upon the occurrence of (1) any failure by Borrower to pay as and when due any installment of principal or interest due hereunder; (2) any default or failure by Borrower to observe any covenant, condition or agreement under the terms of this Note, the Deed of Trust, or any other security documents heretofore or hereafter executed by Borrower to secure this Note; (3) the filing by Borrower of a voluntary petition in bankruptcy, the adjudication of Borrower or as bankrupt or insolvent, the filing by Borrower of any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, or Borrower's seeking or consenting to or acquiescence in the appointment of any trustee, receiver or liquidator or the making of any general assignment for the benefit of creditors or its, his or her admission in writing of its, his or her inability to pay its, his or her debts generally as they become due; (4) the entry by a court of competent jurisdiction of an order, judgment, or decree approving a petition filed against Borrower seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency, or other relief for debtors, which order, judgment or decree remains unvacated and unstayed for sixty (60) consecutive days from the date of entry thereof, or the appointment of any trustee, receiver or liquidator of Borrower or of a substantial part of its, his or her property or of any or all of the rents, revenues, issues, earnings, profits or income thereof; (5) the death or incompetency of a natural person (provided that the death or incompetency of a natural person shall not constitute an Event of Default if, within 120 days of his death or adjudication of incompetency, his estate or personal representative, as the case may be, ratifies and affirms in writing to Lender the obligations of Borrower hereunder); (6) the occurrence of any material adverse change in the financial condition of Borrower.

Upon any default, Lender (or any subsequent holder hereof) shall be entitled to recover all reasonable expenses of collecting this Note, including without limitation court costs and attorneys' fees.

1387964

Exhibit A-1

**PLAINTIFF'S EXHIBIT**

tabbies

Should either party depart this life prior to the amount being paid in full, this note and the amount due hereunder shall be deemed paid in full.

With respect to the amounts due under this Note, Borrower waives the following:

(1)    All rights of exemption of property from levy or sale under execution or other process for the collection of debts under the Constitution or laws of the United States or any state thereof;

(2)    Demand, presentment, protest, notice of dishonor, notice of non-payment, diligence in collection, and all other requirements necessary to charge or hold the undersigned liable on any obligations hereunder; and

(3)    Any further receipt for or acknowledgment of any collateral now or hereafter deposited as security for the obligations hereunder.

In no event shall the amount of interest due or payable hereunder exceed the maximum rate of interest allowed by applicable law, and in the event any such payment is inadvertently paid by Borrower or inadvertently received by Lender (or any holder), then such excess sum shall be credited as a payment of principal, unless Borrower elects to have such excess sum refunded to Borrower forthwith. It is the express intent hereof that Borrower not pay and Lender (or any holder) not receive, directly or indirectly, interest in excess of that which may be legally paid by Borrower under applicable law.

BORROWER AND LENDER HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS NOTE, THE DEED OF TRUST, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS NOTE OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS NOTE, THE DEED OF TRUST, OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR IN CONNECTION WITH THE TRANSACTIONS RELATED THERETO OR CONTEMPLATED THEREBY OR THE EXERCISE OF EITHER PARTY'S RIGHTS AND REMEDIES THEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. BORROWER AND LENDER AGREE THAT EITHER OR BOTH OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED AGREEMENT BETWEEN THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY, AND THAT ANY DISPUTE OR CONTROVERSY WHATSOEVER BETWEEN THEM SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

Lender shall not by any act, delay, omission, or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by Lender. All rights and remedies of Lender under the terms of this Note, and applicable statutes or rules of law, shall be cumulative and may be exercised successively or concurrently.

Borrower agrees that there are no defenses, equities or setoffs in respect to the obligations set forth herein.  The obligations of Borrower hereunder shall be binding upon and enforceable against Borrower and its successors and assigns.  This Note shall be governed by, and construed in accordance with, the laws of the Commonwealth of Virginia.  Any provision in this Note which may be unenforceable or invalid under any law shall be ineffective to the extent of such unenforceability or invalidity without affecting the enforceability or validity of any other provision hereof.

**IN WITNESS WHEREOF,** Borrower has caused this instrument to be executed the day and year first above written.

Marjorie L. Wall

COMMONWEALTH OF VIRGINIA,

CITY/COUNTY OF Prince Edward , to-wit:

The foregoing Note was acknowledged before me by Marjorie L. Wall this 30th day of September, 2013.

Notary Public

My Commission expires: 12/31/2013

Registration Number: 7249289

TAMMY BRYANT RIDDLE
COMMONWEALTH
REGISTRATION NO.
7249289
MY COMM. EXPIRES
12/31/2013
OF VIRGINIA
NOTARY PUBLIC

1387964

Exhibit A-3